[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The defendant has moved for Reargument and/or Reconsideration Post-judgment. After hearing the Court agrees that its finding as to the mortgage balance on a particular property was erroneous. It also agrees that it erroneously entered duplicate orders with respect to the defendant's 401(K) plan. These errors significantly impacted the earlier decision of August 20, 2002 and, for equitable reasons, the Court must reconsider said decision. The Court also agrees with the defendant that it is necessary to revisit all of the financial orders under the circumstances, both for further clarification and because of the overall effect of the individual financial orders on the scheme of property distribution. Sunbury v. Sunbury, 210 Conn. 170, 175 (1989).
Accordingly, this Memorandum of Decision shall replace the earlier decision of August 20, 2002.
This is a limited dissolution of marriage action commenced by the plaintiff in July 1998. The defendant filed an answer and counter complaint.
Both seek a dissolution, joint custody of their minor children, support and a division of property.
Both parties were represented by counsel, and a guardian ad litem was appointed for the two minor children, whose report was filed with the Court.
 Jurisdiction and Related Findings
1. The plaintiff, whose maiden name was Patricia L. Miller, and the defendant intermarried at Longmeadow, Massachusetts on October 5, 1985
2. The plaintiff has resided continuously within the state of Connecticut for at least twelve months next preceding the date of her complaint. CT Page 13867
3. The marriage between the parties has broken down irretrievably and there is no reasonable prospect of reconciliation.
4. The parties have two minor children issue of the marriage, namely: Kenneth W. Godek, born January 29, 1989 and Kimberly L. Godek, born January 24, 1992.
5. No other minor children have been born to the plaintiff since the date of the marriage of the parties.
6. Neither of the parties or said minor children have or are receiving aid or assistance from the state of Connecticut.
7. The Court has jurisdiction in this matter.
 Applicable Law
Connecticut General Statutes § 46b-81 sets forth the considerations to be used in determining the equitable distribution of marital assets. Those considerations include the length of the marriage, the cause for the dissolution, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. The Court shall also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates. "Contribution" includes nonmonetary as well as monetary contributions and includes homemaking and primary caretaking responsibilities. O'Neill v. O'Neill,13 Conn. App. 300, 311-12 (1988).
In entering its property orders, the Court shall take into consideration all of the criteria set forth in § 46b-81, but is not required to make express findings on each of the criteria, Weiman v.Weiman, 188 Conn. 232, 234 (1982), nor is it required to give equal weight to each of the specified criteria and no single criteria is preferred over the other. The Court has wide latitude in weighing each criteria under the individual circumstances of each case. Carpenter v.Carpenter, 188 Conn. 736, 740-41 (1982). Collucci v. Collucci,33 Conn. App. 536, 539 (1994). The Court's charge is to distribute, as equitably as possible, the marital assets of the parties. Rubin v.Rubin, 204 Conn. 224, 228 (1987).
 Discussion
CT Page 13868
The plaintiff is 44 years of age. She has two post graduate degrees (both masters), and is employed as a school teacher in Springfield, Massachusetts. Her gross salary is $1244 per week.
The defendant is 43 years of age and employed as an engineer at Hamilton Standard Division. His gross salary is $1213 weekly.
The plaintiff is not seeking alimony and there was no evidence to indicate either party is likely to become unable to continue in their respective jobs.
In their proposed orders the plaintiff seeks a division of the assets using a 65/35 split in her favor, while the defendant seeks a 60/40 split in his favor. They do not, however, agree on the value of the assets, or who may have dissipated assets. But the biggest source of contention between the parties is probably the reason for the breakdown. Both issues of valuation and cause for the dissolution require the Court to determine the credibility of the parties and their witnesses.
The Court finds the testimony of the plaintiff and Dr. Kenneth Robson to be worthy of credibility and concludes the plaintiff has proven the defendant's actions to be the substantial cause for the breakdown of this marriage.
The defendant has a controlling personality. He intimidated the plaintiff into participating in deviant and humiliating sexual practices, which in turn caused the plaintiff emotional distress. Eventually she came to be more assertive, but that led to increasing anger and hostility on the part of the defendant and furthered the deterioration of their relationship.
Some of the sexual activities defendant imposed on the plaintiff included tying her up, blindfolding her while using various devices (dildos and feathers were mentioned), having her wear a dog collar and a leash, cracking a whip (although not actually whipping her), having her shave her public hair and call him daddy during sex, dressing up as a prostitute and emulating actresses in pornographic films, among other things.
Dr. Robson concluded that the plaintiff was suffering from post traumatic stress disorder (PTSD) as a result of her humiliating and stressful sexual experiences. She was referred to a psychiatrist by Dr. Robson whose treatment has been helpful.
The defendant denies some of the claimed sexual activity and minimizes CT Page 13869 others, but his testimony lacks credibility.
For example, on direct examination by his attorney he denied having or using a whip as alleged, then on cross examination admitted buying a so-called love kit for his wife on occasions such as Valentine's Day or anniversaries which included such things as blindfolds, feathers, dildos and whips.
He was also arrested in Springfield, Massachusetts for soliciting a prostitute (who turned out to be a police decoy) during the course of the marriage. His explanation on direct examination was that he was walking to his vehicle, saw a woman who appeared to be a prostitute and jokingly asked her "how much", and claims he had no intention of doing anything with her. On cross-examination (with defense counsel in possession of the police report), he admitted going into some detail with the undercover policewoman about not only the cost but the nature of the sex act he was seeking (oral sex). Further, he ultimately pleaded guilty to the charge and paid a fine.
Yet another instance where the defendant attempted to obfuscate the truth or defy credulity concerned the shooting of a rabbit. The plaintiff testified he shot the rabbit and brought it to the plaintiff in the house, showed her the bullet hole and said "see how easy it is", making a veiled threat. His testimony was that after shooting the rabbit he showed it to the plaintiff as a joke, saying that he shot the "Wascally Wabbit."
Given that the plaintiff has been diagnosed with PTSD as a result of his treatment of her, his minimizing of the facts is lacking in candor and credibility. The Court is entitled to consider whether any of his testimony as to critical matters is reliable or credible.
There was also evidence that the defendant attempted to manipulate his financial picture. concerns include the following:
 A. The defendant kept substantial amounts of cash in the home. His wife found about $3000 in a shoe box and about $2000 in a medicine container. The defendant testified that he usually had about $10,000 in cash which he claims, implausibly, was for emergencies such as a medical situation. (He does have medical insurance through his employment). His testimony that the plaintiff knew where he kept some of the cash (in a strong box) and could access it if she wished is not credible. There would have been a major blow-up if she had ever done so.
CT Page 13870
 B. The parties own a summer home in West Dennis, Massachusetts which they purchased in 1994. As part of the purchase price they entered into an lease agreement with a friend, Michael Zajchowski. Mr. Zajchowski gave the parties $18,600 and in return was entitled to use the place for three weeks each year for twelve years (equivalent to $1,550 per year). While the dissolution was pending the defendant gave $9,700 to Mr. Zajchowski. Approximately six months later he asked Mr. Zajchowski for the money back saying he needed to buy a condominium, and the money was returned. After the condominium was purchased the defendant asked Mr. Zajchowski to sign an affidavit that the money was a loan to the defendant, but Mr. Zajchowski declined to do so.
 C. The defendant's mother testified that she loaned him $10,000 to purchase the condominium and submitted a purported loan agreement dated July 14, 1999 to that effect. It appears that the "loan agreement" (which does not qualify as a promissory note) was an after thought since Mrs. Godek testified she gave him the money sometime prior to July 14, 1999. It is also noted that in a previous financial affidavit dated January 27, 2000, the defendant listed liabilities of $30,000 owing to family members. That was not true. At least $9,700 that he gave to Mr. Zajchowski was included as was the questionable "loan" from his mother. The defendant's explanation was these were "tentative" loans he expected to make from his sister (which he never did) and from Mr. Zajchowski (which was never a loan).
 D. The defendant hired an appraiser Christopher Burke, to appraise the jointly owned marital home. Mr. Burke testified that during his appraisal visit, the defendant expressed strong opinions to him as to the value of the home, to the point where he (Mr. Burke) had to admonish the defendant.
The foregoing discussion addresses issues of credibility and cause for the dissolution. Other facts will be discussed as needed to explain the orders being entered.
 ORDERS
Dissolution: The court finds the marriage has broken down irretrievably. Judgment shall enter dissolving the marriage on said grounds.
Custody: The parties shall have joint legal custody of the minor children, Kenneth Godek and Kimberly Godek. Primary residence of said children shall be with the CT Page 13871 plaintiff.
Parental Access Schedule: The parties are agreeable to Dr. Kenneth Robson's recommendations and plans for implementing a parenting schedule. Dr. Robson's recommendations are also supported by the guardian ad litem (Ref. Report of GAL 6/7/02. Accordingly, the following orders, as recommended by Dr. Robson are entered: (Ref. Exhibit A-p. 39).
The defendant shall have reasonable visitation in accordance with the following:
 A. The goal of paternal access is, over time and with feedback, to achieve a normalized pattern of conduct between both children and their father. If joint legal custody is to be meaningful, the defendant needs to involve himself in the children's lives, events and school activities in a comfortable way for them and for him. This plan's goals would include overnights on alternating weekends, holidays and planned vacations during the school year and in the summer. Mid-week visits should be continued in whatever final version this plan may take but the number of contacts per week and therefore, transitions, should be reduced as much as possible so that paternal access occurs in blocks of time rather than scattered on multiple occasions through the same week.
 B. This plan's evolution should occur over six months from the date of judgment in this case and should be guided by the following principles:
1. Input from the children should be minimal.
 2. A clinical coach (Amy Brenner) should be present for as much visitation time as possible in order to provide immediate and onsite feedback to Gary Godek regarding his practices.
 3. A substantial portion of paternal visitation should occur alone with each child in order to reduce conflict and stress; the precise proportion of time spent with each child alone rather than both together should be flexibly designed but is an important aspect of a successful plan.
 4. The children's phone calls to their mother during paternal visitation should be reduced, if not eliminated. The children's keeping of journals with regard to paternal visitation should be CT Page 13872 discouraged.
 5. Any communications to outside agencies such as the police, DCF, etc. must initially be reviewed by the attorney for the minor children/GAL; only if there is clear and credible evidence for the involvement of an outside agency should that take place and only after the review by the attorney/GAL. Violations of this principle by either or both children, other than in a clear and convincing emergency, should lead to additional paternal visitation time being instituted as soon after as possible. If a pattern of contacting outside agencies continues, a review of the custodial plan and modification of it may be in order.
 6. Paternal home should be kept clean and in order and the children should be encouraged to purchase bedding, pictures, etc. for their own space in the company of their father.
 7. Both father and children need to eliminate physical interactions to deal with conflict resolution; violation of this principle on father's part may lead to a decrease in paternal access.
 8. An experienced male child and adolescent clinician should be involved in working with both children and both parents flexibly in order to facilitate number 4 above. I would be happy to participate in the selection of that clinician but it is clear that both parents' approval should be forthcoming prior to the start of this process. Individual therapeutic efforts by both parents would also be important and useful.
 9. The architecture and timing of this access plan in 3 above may best be worked out through discussions among this evaluator and the attorney/GAL for the minor children in consultation with both parents. A fully designed plan should be developed immediately and put into effect as soon as possible.
Child Support: The defendant shall pay child support in the amount of $210 per week. He shall also pay 38% of unreimbursed medical expenses for the minor children (in substantial compliance with child support guidelines). The child support is to be by way of a wage withholding order in accordance with § 52-362
(b) of the General Statutes. The defendant shall make said payments directly to the plaintiff until such time as the wage withholding goes into effect. CT Page 13873
Health Insurance: The defendant shall maintain health insurance for the minor children as available through his employer. If such insurance becomes unavailable through no fault of the defendant the plaintiff shall maintain health insurance for the minor children as available through her employer. Each party shall be responsible for his or her own medical insurance and medical expenses.
Life Insurance: The parties shall maintain life insurance as available through their respective employers naming the children as irrevocable beneficiaries until the youngest attains the age of eighteen.
Tax Exemptions: Each party shall receive one child for federal and state tax exemption purposes as long as both children remain eligible dependents. When one child ceases to be illegible the parties shall alternate taking the remaining child as a tax exemption with the plaintiff using the first year.
Real Estate: The defendant shall quit-claim his interest in the jointly owned marital home located at 1 Lois Lane, Enfield, Connecticut and the plaintiff shall assume the mortgage and costs of maintaining the property, and hold the defendant harmless.
 The husband shall retain title to the condominium he owns at 64 Candlewood Drive, Enfield, Connecticut.
 The plaintiff shall quit-claim her interest in the jointly owned vacation home located at 10 Regan Road, West Dennis, Massachusetts and the defendant shall assume any costs or expenses associated with said property and hold the plaintiff harmless.
 The fair market value of the property located at Lois Lane in Enfield is approximately $172,500.
 When the property was purchased the plaintiff contributed $12,000 to the down payment while the defendant contributed $24,000. There is a present mortgage balance of approximately $41,000. There was, however, testimony that approximately $20,000 of the mortgage balance of $41,000 on this property was used in the purchase of the Cape Cod property being CT Page 13874 distributed to the defendant. In effect, when the plaintiff is paying down this mortgage $20,000 will inure to the defendant's benefit. The Court is mindful of the $12,000 deferential in down payment contributions by the parties.
 Thus, while the equity in this property is approximately $131,500, when the off-setting adjustments are made between the down-payments and the benefit to the defendant's Cape Cod property, that equitable interest is about $123,500.
 The fair market value of the Cape Cod vacation home is found to be between $190,000 and $200,000, or approximately $195,000.
There is no mortgage on this property.
 The Court rejects the defendant's claim that it should accept the appraisal submitted by his professional appraiser over the less detailed market analysis submitted by the plaintiff. It is for the trier of fact to determine the credibility of witnesses and documentary evidence. In this case both parties submitted their experts' written reports without testimony, but there was testimony from the parties as to the condition of the property and improvements made to it. In addition, a photograph of the house was introduced. The Court did not accept in full either parties valuation, but made an independent determination, using its best judgment, from the evidence presented.
 The condominium purchased by the defendant during the marriage has a fair market value of $130,000. The money to purchase the condominium came from various sources, including $19,500 from marital assets, approximately $50,000 taken from his 401 K savings and other assets. The property has an equity of approximately $75,000.
 To summarize the approximate equities in the real estate, the plaintiff will have equity in the marital home of $123,500 and the defendant will have equity in his condominium and the vacation home of $270,000.
CT Page 13875
Pension: Each party shall keep his or her own pension.
 The defendant shall distribute $200,000 from his 401(K) plan to the plaintiff as an additional property settlement by way of a qualified domestic relations order. Evidence presented at trial indicated the value of this 401(K) plan was approximately $263,000. (Most of this account was accumulated during the course of the marriage).
 The defendant argues that the value of the 401(K) plan, as of August 20, 2002, is $28,000 less than at the date of trial. He argues that case law requires any property to be valued as of the date of judgment (which was August 20, 2002).
 The Court declines to make any adjustment. While the defendant is correct that, as a general rule, marital assets are to be divided based on their value at the time of judgment, when there is a delay between the time of trial and the date of judgment, absent any new evidence, the Court can only rely on the evidence presented at trial as it did in this case. The cases cited by the defendant, Wendt v. Wendt, 59 Conn. App. 656 (2000) and Bornemann v. Bornemann, 245 Conn. 508 (1998), are distinguishable. In Wendt
the Court was dealing with the issue of whether valuation should be made at the time of separation or time of judgment and the Bornemann case dealt with an issue of date of remand or date of judgment.
 It is also noteworthy that the defendant himself is largely responsible for any fluctuations in the value of his plan. He testified that he personally manages his 401(K) and makes frequent transfers of assets in the account.
Other Assets: The plaintiff shall retain her interest in her deferred compensation plan (New York Life 403b) of approximately $14,000, and her Massachusetts teachers' retirement plan of approximately $33,400. She shall retain her several bank accounts of approximately $9,400. The plaintiff shall receive the sum of $19,500 in cash being held as a marital asset by the CT Page 13876 defendant.
Attorneys' Fees: The defendant shall pay $8,000 toward the plaintiffs attorney's fees.
Personal Property: Personal property shall remain in the possession of the party presently in possession with the exception of the power saw which shall be turned over to the defendant.
Other: Each party shall be responsible for the debts as shown on their financial affidavits.
 The defendant is still obligated to the plaintiff his share of unpaid pendente lite automobile insurance and orthodontist bills.
 Bank accounts presently held by either party in the names of their minor children shall remain in the children's names. Any savings bonds or other bonds in the children's names shall be turned over to the attorney for the plaintiff to be held in escrow by the attorney.
 Alimony is not awarded to either party.
The Court shall retain jurisdiction to decide any issues that may arise regarding the implementation of these financial orders, including retaining jurisdiction to order a sale of real estate if necessary to implement the distribution of assets in accordance with the intent of this judgment and to preserve the integrity of this judgment. Santoro v.Santoro, 70 Conn. App. 212, 217 (2002).
 ___________________, JTR Klaczak
CT Page 13877